J-S01045-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| LEHIGH ANESTHESIA ASSOCIATION | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellant | |
| v. | |
| MICHAEL MELLON, CRNA | |
| Appellee | No. 1570 EDA 2015 |

Appeal from the Order May 5, 2015
In the Court of Common Pleas of Lehigh County
Civil Division at No(s): 2012-C-3692

BEFORE:  GANTMAN, P.J., MUNDY, J., and MUSMANNO, J.

MEMORANDUM BY GANTMAN, P.J.:                **FILED APRIL 26, 2016**

Appellant, Lehigh Anesthesia Association ("LAA"), appeals from the order entered in the Lehigh County Court of Common Pleas, which granted summary judgment in favor of Appellee, Michael Mellon, CRNA.  We affirm.

The relevant facts and procedural history of this case are as follows. Appellee, a certified nurse anesthetist, began working for LAA in 2001.  Both parties entered into a written employment agreement ("Agreement") on September 24, 2001.  Paragraph 9 of the Agreement contains a restrictive covenant, which states in relevant part:

> 9. <u>Restrictive Covenant</u>
>
> A.    In the course of inviting Employee to join Employer's practice of anesthesia, and in his employment, he will be introduced to and have made available to him certain of Employer's contacts and referring doctor relationships, hospital sources, business and professional

relationships and the like. Employee acknowledges that because he has not been in a private (fee-for-service) practice in anesthesia previously, he has no referring doctor or facility following in the area, nor does he have any substantial experience in the "business" of a private, fee-for-service anesthesia practice.

Accordingly, Employee recognizes and agrees that termination of his employment for any reason followed by his entering into a business or practice competitive with that of Employer (i.e., the rendering of anesthesia services to clients of Employer), as an employee, owner, contractor, or otherwise, would allow Employee to take many of the sources of the Employer's success with Employee to the ongoing practice's detriment, for Employer would have established the Employee is in a situation that makes him a very strong competitor for the Employer's current and potential practice sources.

Therefore, Employee agrees that he will pay to Employer the amount specified below for each "client" of "Employer" for whom he, or his subsequent employers(s), employee(s), subcontractor(s) or the like, provide, services to within the twenty-four (24) months after termination of this Agreement. Any amounts payable hereunder shall be due in two (2) equal installments thirteen (13) and twenty-five (25) months after commencement of Employee's competitive activity.

For purposes of this Paragraph 9, "Employer" is defined to include Lehigh Anesthesia Associates, P.C., and the Center for Ambulatory Anesthesia, Inc., and Employer's "clients" are clients of any of those entities.

\* \* \*

For this purpose, Employer's clients are clients for whom Employer has provided any billable services within the forty-eight (48) months preceding Employee's termination of employment.

\* \* \*

B. For the reasons described above, Employee

- 2 -

further agrees he will not solicit any clients or contractual arrangement of the Employer or convert to his possession and/or disclose in any manner any contractual arrangements, patient lists, addresses or other data about the patients, clients, and/or contracts neither before nor after termination of his employment hereunder. All such information is hereby agreed to be confidential to Employer and of essential importance to its ongoing practice. All reasonable legal fees and costs incurred by Employer in connection with the enforcement of this subparagraph upon a breach hereof of Employee shall be paid by employee.

(**See** Appellee's Brief in Support of Motion for Summary Judgment, Exhibit D at 6-8; R.R. at 25a-27a). LAA subsequently terminated Appellee's employment in May 2012, after receiving numerous complaints from patients and clients regarding Appellee's poor work and behavior. Thereafter, Appellee began working for Professional Anesthesia Consultants, P.C. ("PAC") in King of Prussia. While working for PAC, Appellee provided anesthetist services for Carlisle Endoscopy Center ("CEC"), one of LAA's clients from 2001 until 2011.

On September 6, 2012, LAA filed a *praecipe* for a writ of summons against Appellee. LAA filed a complaint on February 28, 2013, against Appellee that alleged breach of the Agreement's restrictive covenant. Appellee filed on March 20, 2013, an answer with new matter and counterclaims. On April 11, 2013, LAA filed an answer and new matter to the counterclaims, to which Appellee replied. Appellee filed, on April 30, 2014, a motion for summary judgment and a brief in support of his motion. LAA filed a response on May 30, 2014, as well as a memo in opposition to

the summary judgment motion. Appellee filed a reply brief on June 10, 2014.

The court granted Appellee's summary judgment motion on September 2, 2014, as to all of LAA's claims. Thereafter, Appellee filed a *praecipe* to discontinue his counterclaims. LAA timely filed a notice of appeal on May 29, 2015. The court ordered LAA on June 5, 2015, to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b), and LAA timely complied on June 25, 2015.

LAA raises the following issues for our review:

> DID THE TRIAL COURT ERR AS A MATTER OF LAW AND/OR ABUSE ITS DISCRETION IN HOLDING THAT BECAUSE [LAA] HAD TERMINATED [APPELLEE]—REGARDLESS OF THE REASON—THEN AS A MATTER OF LAW, [LAA] FORFEITED THE RIGHT TO ENFORCE THE CLIENT-SPECIFIC RESTRICTIVE COVENANT IN [APPELLEE'S] EMPLOYMENT AGREEMENT, AND IN RELYING ON ***INSULATION CORP. OF AMERICA V. BROBSTON***, 667 A.2D 729 (Pa.Super. 1995) FOR THAT PROPOSITION?
>
> DID THE TRIAL COURT ERR AS A MATTER OF LAW AND/OR ABUSE ITS DISCRETION IN GRANTING [APPELLEE'S] SUMMARY JUDGMENT MOTION, AND REFUSING TO ENFORCE THE CLIENT-SPECIFIC RESTRICTIVE COVENANT IN [LAA'S] EMPLOYMENT AGREEMENT, ON THE BASIS THAT THE COVENANT WAS AIMED AT RESTRAINING [APPELLEE] "FROM THE EXERCISE OF HIS PROFESSION WITHIN CERTAIN GEOGRAPHIC...BOUNDS" WHEN THE COVENANT CLEARLY WAS NOT BASED ON ANY GEOGRAPHIC LIMITATION?
>
> DID THE TRIAL COURT ERR AS A MATTER OF LAW AND/OR ABUSE ITS DISCRETION IN GRANTING [APPELLEE'S] SUMMARY JUDGMENT MOTION AND REFUSING TO ENFORCE THE RESTRICTIVE COVENANT IN HIS EMPLOYMENT AGREEMENT ON THE BASIS THAT THERE

WAS NO GENUINE ISSUE ON THE MATERIAL FACT AS TO WHETHER [LAA] HAD TERMINATED [APPELLEE] FOR POOR JOB PERFORMANCE?

(LAA's Brief at 5).

In the issues combined, LAA argues the restrictive covenant at issue should be enforced.  LAA claims the court's reliance on **Brobston, supra** is misplaced in light of more recent case law that confirms LAA's termination of Appellee does not automatically prohibit LAA as a matter of law from enforcing a restrictive covenant against Appellee.  LAA also alleges the restrictive covenant did not prohibit Appellee from practicing his profession within a particular geographic area upon termination; the covenant allowed Appellee to provide anesthesia services at any facility so long as it was not one of the 40+/− medical offices or facilities in eastern and central Pennsylvania under contract with LAA or which had been under contract with LAA during the four-year period before Appellee's termination.  LAA claims Appellee violated these terms of the restrictive covenant when, after his termination in 2012, Appellee took a position with PAC in King of Prussia. While working for PAC, Appellee provided anesthesia services for CEC, one of LAA's clients from 2001 until 2011.  LAA asserts the court in this case misperceived there was some "geographic extent" to the restrictive covenant, as Appellee could have worked for any employer that did not meet the restrictive covenant definition of a "client."  LAA states it had a particular interest to protect and Appellee's termination did not affect his ability to

earn a living. LAA maintains there are genuine issues of material fact which barred summary judgment. LAA concludes this Court should reverse the order granting summary judgment and remand for further proceedings. We do not agree.

Initially, we observe:

> Our scope of review of an order granting summary judgment is plenary. [W]e apply the same standard as the trial court, reviewing all the evidence of record to determine whether there exists a genuine issue of material fact. We view the record in the light most favorable to the non-moving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party. Only where there is no genuine issue as to any material fact and it is clear that the moving party is entitled to a judgment as a matter of law will summary judgment be entered. All doubts as to the existence of a genuine issue of a material fact must be resolved against the moving party.

> Motions for summary judgment necessarily and directly implicate the plaintiff's proof of the elements of [his] cause of action. Summary judgment is proper if, after the completion of discovery relevant to the motion, including the production of expert reports, an adverse party who will bear the burden of proof at trial has failed to produce evidence of facts essential to the cause of action or defense which in a jury trial would require the issues to be submitted to a jury. In other words, whenever there is no genuine issue of any material fact as to a necessary element of the cause of action or defense, which could be established by additional discovery or expert report and the moving party is entitled to judgment as a matter of law, summary judgment is appropriate. Thus, a record that supports summary judgment either (1) shows the material facts are undisputed or (2) contains insufficient evidence of facts to make out a *prima facie* cause of action or defense.

> Upon appellate review, we are not bound by the trial

court's conclusions of law, but may reach our own conclusions. The appellate Court will disturb the trial court's order only upon an error of law or an abuse of discretion.

Judicial discretion requires action in conformity with law on facts and circumstances before the trial court after hearing and consideration. Consequently, the court abuses its discretion if, in resolving the issue for decision, it misapplies the law or exercises its discretion in a manner lacking reason. Similarly, the trial court abuses its discretion if it does not follow legal procedure.

\* \* \*

Where the discretion exercised by the trial court is challenged on appeal, the party bringing the challenge bears a heavy burden.

[I]t is not sufficient to persuade the appellate court that it might have reached a different conclusion if…charged with the duty imposed on the court below; it is necessary to go further and show an abuse of the discretionary power. An abuse of discretion is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will, as shown by the evidence or the record, discretion is abused.

\* \* \*

*Glaab v. Honeywell Intern., Inc.*, 56 A.3d 693, 696-97 (Pa.Super. 2012)

(quoting *Chenot v. A.P. Green Services, Inc.*, 895 A.2d 55, 60–62

(Pa.Super. 2006) (internal citations and quotation marks omitted)).

Contract construction and interpretation is a question of law for the

court to decide. *Profit Wise Marketing v. Wiest*, 812 A.2d 1270, 1274

(Pa.Super. 2002); *J.W.S. Delavau, Inc. v. Eastern America Transport & Warehousing, Inc.*, 810 A.2d 672, 681 (Pa.Super. 2002), *appeal denied*, 573 Pa. 704, 827 A.2d 430 (2003) (reiterating: "The proper interpretation of a contract is a question of law to be determined by the court in the first instance"). In construing a contract, the intent of the parties is the primary consideration. *Tuscarora Wayne Mut. Ins. Co. v. Kadlubosky*, 889 A.2d 557, 560 (Pa.Super. 2005).

> When interpreting agreements containing clear and unambiguous terms, we need only examine the writing itself to give effect to the parties' intent. The language of a contract is unambiguous if we can determine its meaning without any guide other than a knowledge of the simple facts on which, from the nature of the language in general, its meaning depends. When terms in a contract are not defined, we must construe the words in accordance with their natural, plain, and ordinary meaning. As the parties have the right to make their own contract, we will not modify the plain meaning of the words under the guise of interpretation or give the language a construction in conflict with the accepted meaning of the language used.
>
> On the contrary, the terms of a contract are ambiguous if the terms are reasonably or fairly susceptible of different constructions and are capable of being understood in more than one sense. Additionally, we will determine that the language is ambiguous if the language is obscure in meaning through indefiniteness of expression or has a double meaning.

*Profit Wize Marketing, supra* at 1274-75 (internal citations and quotation marks omitted).

> Where there is any doubt or ambiguity as to the meaning of the covenants in a contract or the terms of a grant, they should receive a reasonable construction, and one that will accord with the intention of the parties; and, in order to ascertain their intention, the court must look at the

circumstances under which the grant was made. It is the intention of the parties which is the ultimate guide, and, in order to ascertain that intention, the court may take into consideration the surrounding circumstances, the situation of the parties, the objects they apparently have in view, and the nature of the subject-matter of the agreement.

***Giant Food Stores, LLC v. THF Silver Spring Development, L.P.***, 959 A.2d 438, 448 (Pa.Super. 2008), *appeal denied*, 601 Pa. 697, 972 A.2d 522 (2009) (internal citations and quotation marks omitted). In either event, "[T]he court will adopt an interpretation which under all circumstances ascribes the most reasonable, probable, and natural conduct of the parties, bearing in mind the objects manifestly to be accomplished." ***E.R. Linde Const. Corp. v. Goodwin***, 68 A.3d 346, 349 (Pa.Super. 2013).

The general rules of contract interpretation also apply in the context of restrictive covenants. ***Baumgardner v. Stuckey***, 735 A.2d 1272, 1274 (Pa.Super. 1999). Non-compete covenants in employment contracts exist to protect the rights of the employer. ***Hess v. Gebhard & Co.***, 570 Pa. 148, 159, 808 A.2d 912, 918 (2002). These covenants are important business tools, because they allow employers to prevent their employees and agents from learning the employers' business practices and then moving into competition with them. ***Id.*** Non-compete clauses permit an employer to protect its legitimate business interests, client base, good will, and investments in employees. ***WellSpan Health v. Bayliss***, 869 A.2d 990, 996 (Pa.Super. 2005).

For a covenant not to compete to be enforceable in Pennsylvania, it

must be: (1) ancillary to the employment relationship; (2) reasonably necessary for the protection of the employer; (3) reasonable in duration and geographic reach. *Missett v. Hub Inter. Pennsylvania, LLC*, 6 A.3d 530, 538 (Pa.Super. 2010). For an employment restriction to be considered "ancillary to employment," the restriction must relate to a contract of employment. *Modern Laundry & Dry Cleaning Co. v. Farrer*, 536 A.2d 409, 411 (Pa.Super. 1987). So long as the employment restriction is "an auxiliary part of the taking of employment and not a later attempt to impose additional restrictions on an unsuspecting employee, such a covenant is supported by valid consideration and is therefore enforceable." *Id.* Pennsylvania courts have consistently held the acceptance of employment is sufficient consideration to support a restrictive covenant. *Brobston, supra* at 733; *Modern Laundry & Dry Cleaning Co., supra* at 411; *Records Center, Inc. v. Comprehensive Management, Inc.*, 525 A.2d 433 (Pa.Super. 1987).

Nevertheless,

> Post-employment restrictive covenants are subject to a more stringent test of reasonableness…. This heightened scrutiny stems from a historical reluctance on the part of our courts to enforce any contracts in restraint of free trade, particularly where they restrain an individual from earning a living at his trade. This close scrutiny also stems from our recognition of the inherently unequal bargaining positions of employer and employee when entering into such agreements. The determination of whether a post-employment restrictive covenant is reasonable, and therefore enforceable, is a factual one which requires the court to consider all the facts and circumstances. A

restrictive covenant found to be reasonable in one case may be unreasonable in others.

*Brobston, supra* at 733-34 (internal citations omitted). "[A] post-employment covenant that merely seeks to eliminate competition *per se* to give the employer an economic advantage is generally not enforceable. The presence of a legitimate, protectable business interest of the employer is a threshold requirement for an enforceable non-competition covenant." *WellSpan Health, supra* at 996-97 (citations omitted). "If the threshold requirement of a protectable business interest is met, the next step in analysis of a non-competition covenant is to apply the balancing test defined by our Supreme Court." *Id.* at 999 (citing *Hess, supra* at 163, 808 A.2d at 920). "First, the court balances the employer's protectable business interest against the employee's interest in earning a living. Then, the court balances the employer and employee interests with the interests of the public." *Id.* To weigh the competing interests of the employer and employee, the court must conduct an examination of reasonableness. *WellSpan Health, supra* at 999.

To determine reasonableness, a covenant must be reasonably necessary for the employer's protection, and the terms of the covenant must be reasonably limited in terms of the temporal and geographical restrictions imposed on the former employee. *Id.* (citations omitted).

> An [employee] may receive specialized training and skills, and learn the carefully guarded methods of doing business which are the trade secrets of a particular enterprise. To

> prevent an [employee] from utilizing such training and information in competition with his former employer, for the patronage of the public at large, restrictive covenants are entered into. They are enforced by the courts as reasonably necessary for the protection of the employer. **A general covenant not to compete, however, imposes a greater hardship upon an [employee] than upon a seller of a business. An [employee] is prevented from practicing his trade or skill, or from utilizing his experience in the particular type of work with which he is familiar**. He may encounter difficulty in transferring his particular experience and training to another line of work, and hence his ability to earn a livelihood is seriously impaired. Further, the [employee] will usually have few resources in reserve to fall back upon, and he may find it difficult to uproot himself and his family in order to move to a location beyond the area of potential competition with his former employer. Contrarywise, the mobility of capital permits the businessman to utilize his funds in other localities and in other industries.

**Brobston, supra** at 734 (citations omitted) (emphasis in original). Furthermore, "[w]hen…the covenant imposes restrictions broader than necessary to protect the employer, we have repeatedly held that a court of equity may grant enforcement limited to those portions of the restrictions that are reasonably necessary for the protection of the employer." **Hess, supra** at 162-63, 808 A.2d at 920 (citation omitted). "If…an employer does not compete in a particular geographical area, enforcement of a non-competition covenant in that area is not reasonably necessary for the employer's protection." **WellSpan Health, supra** at 1001.

Moreover,

> Where an employee is terminated by his employer on the grounds that he has failed to promote the employer's

legitimate business interests, it clearly suggests an implicit decision on the part of the employer that its business interests are best promoted without the employee in its service. The employer who fires an employee for failing to perform in a manner that promotes the employer's business interests deems the employee worthless. Once such a determination is made by the employer, the need to protect itself from the former employee is diminished by the fact that the employee's worth to the corporation is presumably insignificant. Under such circumstances, we conclude that it is unreasonable as a matter of law to permit the employer to retain unfettered control over that which it has effectively discarded as worthless to its legitimate business interests.

***Brobston, supra*** at 735. Still, "the circumstances of termination are, alone, not determinative of whether the restrictive covenant is enforceable under ***Brobston***." ***Missett, supra*** at 539.

Instantly, the trial court relied on ***Brobston*** and concluded:

[D]espite its asseverations in respect to the court's duty to scrutinize the "fact[s] and circumstances" of each case, [LAA] nevertheless fails to point to any fact of record indicative of why the present matter is distinguishable from ***Brobston***. Rather, perusal of [LAA's] brief reveals merely the contention that the present restrictive covenant does not resemble to the sort of "unfettered control" to which ***Brobston*** adverted in arriving at is holding. The argument is unavailing. Here, as in ***Brobston***, the subject covenant is aimed at restraining the previous employee from the exercise of his profession within certain geographic and temporal bounds.

Additionally, [LAA] argues that even though an employee may be terminated for cause, he may still have "knowledge of protectable trade secrets, or significant customer contacts constituting protectable business interests." However, such an argument misconstrues the import of ***Brobston***. The disclosure of trade secrets remains actionable as a common law tort…but what ***Brobston*** proscribes is an employer discarding an

employee deemed worthless by the organization while simultaneously asserting, through a restrictive covenant, that the employee is nevertheless capable of posing a competitive threat. The [Superior] Court, in fact, underscored this very point: "The salesman discharged for poor sales performance cannot reasonably be perceived to pose the same competitive threat to his employer's business interests as the salesman whose performance is not questioned, but who voluntarily resigns to join another business in direct competition with the employer." **Brobston, supra** [at 735-36]. As such, any "significant customer contacts," so long as they do not constitute confidential information protected by the law of tort, cannot be deemed a legitimate business interest of the employer *vis-à-vis* a discarded employee.

The facts and circumstances of this case reveal no genuine issue of fact on the issue of whether [LAA] terminated [Appellee] for what it deemed to be poor job performance. In view of [LAA's] failure to point to any record evidence to refute such a conclusion, as a matter of law it cannot prevail on any claim based on the subject restrictive covenant. [Appellee] is, therefore, entitled to summary judgment in his favor on the claim.

(Trial Court Opinion, filed July 2, 2015, at 4-6) (some internal citations omitted). The record supports this decision. An examination of the restrictive covenant at issue reveals that the terms are both ambiguous and overly broad or unreasonable. The covenant specifically prohibits Appellee from rendering anesthesia services to any of LAA's current or former clients dating back to 2008. (**See** Appellee's Brief in Support of Motion for Summary Judgment, Exhibit D at 6; R.R. at 25a.) The covenant defines "clients" as those "for whom [LAA] has provided any billable services [within] the forty-eight (48) months preceding [Appellee's] termination of employment." **See id.** Nevertheless, LAA interprets the term "clients" more

broadly to include also businesses which conduct business with current and prior clients of LAA, even if these businesses have not been direct clients of LAA. By virtue of this unwarranted extension, LAA wants to hold Appellee in violation of the restrictive covenant because, after his termination, Appellee took a position with PAC in King of Prussia. While working for PAC, Appellee was asked to provide anesthesia services for CEC, which happened to be one of LAA's clients from 2001 until 2011. Thus, the reach of the covenant terms is overly broad and cannot be understood to limit businesses in PAC's position. *See Profit Wize Marketing, supra*. There is no indication from the surrounding circumstances that the parties intended for the covenant to restrict Appellee by restricting his new employer. *See Giant Food Stores, supra*. The covenant restrictions in this regard are broader than necessary to protect LAA's business interests. *See Hess, supra*. Interpreting the covenant so generally as to restrict Appellee from working for any employer that might happen to conduct business with one of LAA's current or former clients places an undue hardship on Appellee in terms of finding potential future employment, especially when coupled with the unlimited geographical scope of the covenant. *See Brobston, supra*. Construing the restrictive covenant so broadly is not reasonably necessary to protect LAA, whereas it prevents Appellee "from practicing his trade or skill, or from utilizing his experience in the particular type of work with which he is familiar." *See id.*; *WellSpan Health, supra*. We conclude the court properly granted

- 15 -

summary judgment in favor of Appellee. ***See Glaab, supra***. Accordingly, we affirm.

Order affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary


Date: 4/26/2016